UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
TNT USA INC.,

               Plaintiff,

     -against-                  <u>MEMORANDUM & ORDER</u>
                                       09-CV-0481(JS)(ARL)

DHL EXPRESS (USA), INC.,

               Defendant.
--------------------------------------X
APPEARANCES
For Plaintiff:    Gary Alexander Stahl, Esq.
                  Jeffrey W. Pagano, Esq.
                  Daniel Dov Edelman, Esq.
                  Crowell & Moring LLP
                  590 Madison Avenue
                  New York, NY 10022

For Defendant:    Joseph F. Donley, Esq.
                  Jenny Ann Hughes, Esq.
                  Dechert LLP
                  1095 Avenue Of The Americas
                  New York, NY 10036

                  Andrew S. Wong, Esq.
                  Christopher S. Ruhland, Esq.
                  Edwin V. Woodsome, Esq.
                  William W. Oxley, Esq.
                  Dechert LLP
                  633 West 5th Street, 26th Floor
                  Los Angeles, CA 90071

SEYBERT, District Judge:

        Plaintiff TNT USA Inc. ("Plaintiff" or "TNT") sued Defendant DHL Express (USA), Inc. ("Defendant" or "DHL") for breach of contract. Pending before the Court are Plaintiff's motion for summary judgment (Docket Entry 83) and Defendant's motion for partial summary judgment, which seeks a determination

that Plaintiff's damages, if any, are limited to a two-year period (Docket Entry 87). For the following reasons, Plaintiff's motion is GRANTED IN PART AND DENIED IN PART. Defendant's motion is GRANTED.

<u>BACKGROUND</u>

The following discussion is taken from the parties' Local Civil Rule 56.1 Statements and Counter-Statements[1] and the exhibits in the record. Any genuine disputes of material facts are noted.

The parties are the United States affiliates of two competing global express parcel shipping networks. (<u>See</u> Def. 56.1 Cntr-Stmt. ¶ 14.) In January 2002, TNT entered into a "National Account Agreement" with Airborne Express, Inc. ("Airborne"). (Pl. Ex. 10, Agreement.) DHL acquired Airborne in 2003 and succeeded to its obligations under the Agreement. (<u>See</u> Pl. Ex. 14, Amend. No. 2 at 1.) The contract was amended three times; the National Account Agreement and Amendment Nos. 1, 2, and 3 constitute the "Agreement" in this case.[2] (Def. 56.1 Cntr-Stmt. ¶ 21.)

---

[1] Each party served a Local Civil Rule 56.1 Statement and a Counter-Statement. In citations, the Court refers to these documents as "Pl. 56.1 Stmt.," "Def. 56.1 Stmt.," "Pl. 56.1 Cntr-Stmt.," and "Def. 56.1 Cntr-Stmt," respectively.

[2] When used in the text, "Agreement" refers to the contract as it was amended through Amendments Nos. 1 2, and 3. In citations, however, "Agreement art. _" refers to the original contract and

## I. The Parties' Agreement

The Agreement "covers the transportation by air of shipments on behalf of [TNT] by [DHL]" (Agreement art. 1), and it provides in relevant part that "[DHL] shall receive from [TNT] such shipments as may be tendered from time to time for transportation by air, and [DHL] shall make all reasonable effort to deliver on a timely basis" (id. art. 3). DHL was responsible for the costs of maintaining the equipment and systems required to fulfill its delivery responsibilities. (See id. art. 4.) TNT received discounted shipping prices under the Agreement, provided that it met a minimum monthly volume of 66,000 "domestic net shipments." (Id. art. 5.) If TNT failed to meet its monthly minimum, DHL was entitled to "adjust the rates or terminate this Agreement." (Id.) The original contract also specified that:

> The rates herein stipulated are based upon an anticipated volume of air express shipments by [TNT] and the intent that [TNT] will tender substantially all air express shipments to [DHL] sufficient to meet the monthly volume requirements. Notwithstanding the foregoing, [TNT] may from time to time use the services of other air express carriers to meet delivery requirements. The parties agree to confer if [TNT] reasonably believes that its air express needs are not being met as to specific pickup and delivery locations.

---

"Amend. No. 1 ¶ _," "Amend. No. 2 ¶ _," and "Amend. No. 3 ¶ _" refer to the respective Amendments.

(Id. art. 11.)  The contract also contained provisions addressing how the parties could terminate the Agreement and what notices were required. (Id. arts. 18, 19.) The contract further provided that "[n]o waiver, alteration or modification of the terms and conditions of this Agreement shall be binding unless in writing and signed by a duly authorized agent of [TNT] and [DHL]." (Id. art. 20.)

As mentioned already, TNT and DHL (or Airborne, prior to its 2003 acquisition by DHL) amended the Agreement three times.  Amendment No. 1, which was effective May 5, 2003, amended the shipping rates. (Pl. Ex. 12, Amend. No. 1.)

Amendment No. 2, which was effective October 14, 2004, reflected several changes to the parties' bargain.  First, it extended the duration of the agreement through October 2014. Second, it changed the termination provision ("Article 18") to provide three ways to terminate the contract:

> (a) Either party may terminate this Agreement upon thirty (30) days prior written notice to the other party in the event of a material breach of any provision of this Agreement.

> (b) Either party may terminate this Agreement without cause upon two (2) years prior written notice to the other party.

> (c) Either party may terminate this Agreement immediately upon the insolvency or bankruptcy of the other party, or if the other party has a receiver or trustee appointed over any of its assets.

(Pl. Ex. 14, Amend. No. 2 ¶ 13.) <u>Third</u>, it updated the notice clause to provide new addresses for the notice recipients (<u>id.</u> ¶ 14) and it included a clause that "[a]ny dispute arising under or in any way connected to this Agreement shall be subject to the exclusive jurisdiction of the courts of New York State, U.S. District County [sic] for the Eastern District of New York" (<u>id.</u> ¶ 15). <u>Fourth</u>, it revised the section titled "Limitations of Liability" to include, in relevant part, the following language: "DHL shall use its best efforts to pick up, transport, and deliver [TNT's] documents and packages in accordance with DHL's regular practices and procedures." (<u>Id.</u> ¶ 12.) <u>Fifth</u>, it provided that "[a]ll shipments transported hereunder shall be subject to the conditions of this Agreement and either DHL's Terms and Conditions of Carriage (Exhibit D) or the Terms and Conditions of Service (Exhibit E) current at the time of shipment, and as published on www.dhl-usa.com." (<u>Id.</u> at ¶ 10.) <u>Sixth</u>, it revised the shipping rates but retained language to the effect that TNT would receive a volume discount:

> The domestic and international Express rates as set forth in the attached Schedule (B) reflect a discount for volume, based upon a minimum monthly amount of five hundred thousand dollars ($500,000) domestic net freight (meaning domestic express and ground delivery services collectively) and international air express charges tendered by [TNT] . . . . If [TNT] does not maintain its minimum volume requirement for three (3)

5

> consecutive months, [DHL] may adjust the
> rates. If [DHL] and [TNT] can not [sic]
> agree on a mutually acceptable rate
> adjustment, within thirty (30) days of [DHL]
> notifying [TNT] of its intent to implement
> new rates, then either party may terminate
> this Agreement on ninety (90) days written
> notice to the other.

(Id. ¶ 4.) The option in this provision to terminate the Agreement on 90 days' notice, when combined with the three ways to terminate the Agreement under Article 18, meant that the parties contemplated four ways to end the contract.

Amendment No. 3, which was effective October 14, 2007, extended the Agreement through December 2014 and changed the shipping rates. (Pl. Ex. 16, Amend. No. 3 ¶¶ 1-2.)

## II. DHL's Financial Woes and Restructuring

By late 2007, DHL was losing millions of dollars each day (see Def. Br. 7), and it made plans to restructure its U.S. operations (see Def. Ex. 9). On May 28, 2008, DHL announced a plan to cut back its U.S. ground infrastructure (the "May 28 Announcement"). (Id.) As part of this plan, DHL would withdraw from certain rural areas and partner with the United States Postal Service ("USPS") to service these areas, which became known as "white spaces." (Gibson Dep. at 89-90.) There is evidence that TNT anticipated the substance of DHL's restructuring at least as early as March 2008 (see, e.g., Def. Ex. 2) and that TNT had formulated a plan to migrate its

business away from DHL prior to the announcement (see Def. Ex. 7).

III. <u>The August 11, 2008 Meeting</u>

On August 11, 2008, DHL executives met with TNT executives to discuss TNT's concerns about DHL's service to the white spaces (the "August 11 Meeting"). (<u>E.g.</u>, Def. Ex. 12.) Bob van Zeyl and Alan Corps of TNT met with Dennis Wieboldt and Michael Tomko of DHL. (<u>See</u> Def. Br. 9.)[3] According to DHL, the discussion focused largely on rumors that TNT had heard concerning DHL's plans to leave the U.S. market. (Wieboldt Dep. at 106.) Wieboldt recalled that TNT's van Zeyl said that TNT was "making some contingency plans" for DHL's withdrawal from the United States. (<u>Id.</u> at 90.)

IV. <u>DHL Stops Shipping TNT's Packages</u>

By the fall of 2008, DHL was planning a more drastic re-strategizing of its U.S. business. In October, DHL made "whisper calls" to certain customers informing them that a public announcement about DHL's U.S. transportation network was imminent. (Def. 56.1 Cntr-Stmt. ¶ 43.) DHL made one such call to TNT on October 30. Defendant admits that Wieboldt told van Zeyl that DHL would stop providing TNT with ground delivery

---

[3] The parties consolidated the supporting papers for their cross-motions into four briefs, which were filed in the following order: TNT's opening brief ("Pl. Br. __"), DHL's opening brief ("Def. Br. __"), TNT's opposition and reply brief ("Pl. Reply __"), and DHL's opposition and reply brief ("Def. Reply __").

services and Saturday pick-ups as of November 22. (Id. ¶ 46.)
He also "recommended" moving all of TNT's business to another
company by December. (Id.) An internal TNT email, dated
October 31, corroborates the whisper call. It explains:

> Yesterday we received a phone call from our
> DHL account executive. He updated us on the
> following:
>
> 22 November they will stop offering the
> ground service.
>
> 22 November they will no longer pick up our
> Saturday material. We will have to move our
> Saturday shipments to UPS and IBC.
>
> He warned us that we should have an
> alternative carrier in place for the peak
> season, which is basically starting in a few
> weeks.

(Pl. Ex. 28 (bullet points omitted).)

There was a follow-up call between TNT's van Zeyl and
DHL's Charles Brewer on November 7. (E.g., Def. 56.1 Cntr-Stmt.
¶¶ 50, 52.) Speaking of this call, van Zeyl testified that he
recounted to Brewer what Wieboldt had told him concerning DHL's
plans (i.e., to stop ground shipments and Saturday pick-ups) and
that Brewer then asked him (van Zeyl) "[w]ell, what are your
plans?" (van Zeyl Dep. at 256.) Van Zeyl testified that he
responded: "[w]ell, obviously we're migrating away. Dennis
[Wieboldt] says we need to be out of here by December 1st, he
recommends we be out of here by December 1st." (Id.) According

to van Zeyl, Brewer responded "that's probably a prudent decision." (Id.)

Three days later, DHL announced that it was stopping domestic-only shipping services in the United States. The following day, November 11, 2008, Wieboldt sent van Zeyl an email with the subject line: "Notice." (Pl. Ex. 35.) The email attached a form letter (the "November 11 Letter") that stated, in relevant part:

> As DHL has previously communicated to you, we will no longer provide your company with Air or Ground domestic services that we currently supply under our existing arrangement.
>
> Specifically, the final pickup for your domestic ground and/or overnight would be January 30th, 2009. It is my strong recommendation that TNT move away from all domestic business prior to December 1, 2008. Please continue to make alternate arrangements for your shipping needs by then.
>
> Additionally, on November 29, 2008 your Saturday pickups and deliveries will be discontinued. Please also make alternate arrangements for these shipments by then. Final pickups will be on your last regularly scheduled date prior to November 29.

(Id.) Van Zeyl forwarded the email to other TNT executives with a note: "Here's the official notice from DHL." (Id.)

## V. Proposed Amendment No. 4

On November 13, DHL sent TNT a draft Proposed Amendment No. 4, which would have accelerated the Agreement's

end-date from December 31, 2014 to December 31, 2008.  (Pl. Ex.
34.)  TNT rejected the proposed amendment and advised DHL that
it was "ready, willing and able" to continue performing under
the Agreement.  (Pl. Ex. 51.)

VI. <u>Aftermath</u>

TNT sued DHL for breach of contract on February 6,
2006.  DHL admits that TNT met its monthly minimum shipping
volume requirements (Def. 56.1 Cntr-Stmt. ¶ 110) and that DHL
continues to supply air and ground shipping services in the
United States to at least some of its customers (<u>id.</u> ¶ 108).

DISCUSSION

For the reasons explained below, TNT's motion for
summary judgment is granted as to liability but denied as to
damages.  DHL's motion limiting TNT's damages to the two-year
notice period is granted.  The discussion that follows addresses
in turn the legal standard, the case for DHL's liability, and
the extent of TNT's alleged damages.

I. <u>Legal Standard</u>

Summary judgment is only appropriate where the moving
party can demonstrate that there is "no genuine dispute as to
any material fact" and that the moving party is entitled to
judgment as a matter of law.  FED. R. CIV. P. 56(a).  In
considering this question, the Court considers "the pleadings,
depositions, answers to interrogatories and admissions on file,

together with any other firsthand information including but not limited to affidavits." _Nnebe v. Daus_, 644 F.3d 147, 156 (2d Cir. 2011); _see also Celotex Corp. v. Catrett_, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986); _McLee v. Chrysler Corp._, 109 F.3d 130, 134 (2d Cir. 1997); _see also_ FED. R. CIV. P. 56(c). "In assessing the record to determine whether there is a genuine issue to be tried . . . the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." _McLee_, 109 F.3d at 134. The burden of proving that there is no genuine issue of material fact rests with the moving party. _Gallo v. Prudential Residential Servs., L.P._, 22 F.3d 1219, 1223 (2d Cir. 1994) (citing _Heyman v. Com. & Indus. Ins. Co._, 524 F.2d 1317, 1320 (2d Cir. 1975)). Once that burden is met, the non-moving party must "come forward with specific facts," _LaBounty v. Coughlin_, 137 F.3d 68, 73 (2d Cir. 1998), to demonstrate that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," _Anderson v. Liberty Lobby_, 477 U.S. 242, 257, 106 S. Ct. 2505, 2514-15, 91 L. Ed. 2d 202, 218 (1986). "Mere conclusory allegations or denials will not suffice." _Williams v. Smith_, 781 F.2d 319, 323 (2d Cir. 1986). And "unsupported allegations do not create a material issue of fact." _Weinstock v. Columbia Univ._, 224 F.3d 33, 41 (2d Cir. 2000).

In contract cases, "summary judgment may be granted . . . only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008). An agreement is ambiguous where "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." Id. "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." Id. "[T]he mere assertion by a party that contract language means something other than what it clearly says is not sufficient to raise a triable issue of fact." 239 East 79th Owners Corp. v. Lamb 79 & 2 Corp., 30 A.D.3d 167, 168, 818 N.Y.S.2d 194, 195 (1st Dep't 2006)

## II. Contract Liability

In New York, the elements of a breach of contract claim are a contract, the plaintiff's performance under the contract, the defendant's breach, and damages resulting from the breach. E.g., Elisa Dreier Reporting Corp. v. Global Naps Networks, Inc., 84 A.D.3d 122, 127, 921 N.Y.S.2d 329, 333 (2d

Dep't 2011).  Here, the undisputed evidence demonstrates that DHL breached the Agreement with TNT.  The parties contracted that in exchange for TNT's meeting monthly shipping volume requirements, DHL would "be responsible for the transportation of each shipment from the point of origin at which the shipment is tendered to it to the delivery to the consignee at point of destination."  (Agreement art. 1.)  TNT met its volume goals, but, in November 2008, DHL unilaterally decided to stop shipping TNT's packages and advised TNT to find another shipping company.  (Pl. Ex. 28.)  Accordingly, TNT is entitled to a summary determination on liability but, as is discussed in the next section, the evidence is insufficient to award TNT summary judgment on damages.  See 4Kids Entm't, Inc. v. Upper Deck Co., 797 F. Supp. 2d 236, 244 (S.D.N.Y. 2011) (on a breach of contract claim, granting plaintiff summary judgment as to liability but not damages).

In addition to a damages argument, which the Court addresses in Section III, DHL gives two reasons why summary judgment should be denied.  Neither is persuasive.  First, DHL argues that the Agreement had a flexible "scope" that permitted it to adjust its obligations to TNT as economic circumstances warranted.  (Def. Br. 30-33.)  It points to language in Amendment No. 2 that "DHL shall use its best efforts to pick up, transport, and deliver Customer's documents and packages in

accordance with DHL's regular practices and procedures" (Amend.
No. 2 ¶ 12), and argues that the "regular practices and
procedures" clause meant that "DHL promised to provide TNT only
those services that DHL was generally offering to customers at a
given time" (Def. Br. 30). It also maintains that "best
efforts" and "reasonable efforts" language elsewhere in the
contract absolved it of delivering packages altogether if
economic conditions made its performance unpalatable. (Id. at
31-33.) Factually, this argument ignores the undisputed
evidence that DHL continues to operate a domestic shipping
network. (Def. 56.1 Cntr-Stmt. ¶ 108.) Thus, even if DHL's
purported reading of the Agreement is a fair one--which it is
not--DHL would still have breached the contract by unilaterally
refusing to continue shipping TNT's packages while continuing to
serve other customers.

DHL's argument is wrong as a legal matter, too. The
Agreement's language concerning its scope is straightforward,
reading in relevant part: "[DHL] shall be responsible for the
transportation of each shipment . . . ." (Agreement art. 1.)
Notwithstanding DHL's cobbling together of phrases from
different parts of the documents, a reasonable person, viewing
the entire Agreement objectively, could not interpret the
contract in a way that would permit DHL to abandon the deal if
the going got rough. The Agreement provided that DHL was

responsible for "each shipment" from TNT and, if the economic climate worsened, it had ways for DHL to terminate the arrangement or change its fees. (Amend. No. 2 ¶¶ 4, 13.) Unless and until the parties terminated the Agreement in accordance with the methods set forth in those provisions, DHL was responsible for the costs and expenses associated with shipping the packages. (Agreement art. 4.)

DHL cannot escape its contractual obligations by citing to "reasonable efforts" or "best efforts" clauses. The "reasonable efforts" clause refers to timely deliveries. (Agreement art. 3.) The "best efforts" clause is contained in the amended "limitations of liability" article as set forth in Amendment No. 2: "DHL shall use its best efforts to pick up, transport, and deliver Customer's documents and packages in accordance with DHL's regular practices and procedures." (Amend. No. 2 ¶ 12.) In the context of the entire Agreement, neither clause can be read as excusing DHL's failure to ship TNT's packages altogether. See Vestron, Inc. v. Nat'l Geographic Soc'y, 750 F. Supp. 586, 593 (S.D.N.Y. 1990) ("A best efforts requirement must be reconciled with other clauses in the contract to the extent possible, not used as a basis for negating them."). Moreover, the reason DHL ascribes to its decision not to continue its relationship with TNT--the recent recession--is not an excuse for breaching the contract. 407 E.

61st Garage, Inc. v. Savoy Fifth Ave. Corp., 23 N.Y.2d 275, 282, 244 N.E.2d 37 (1968) (explaining that a party may "abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts").

Second, DHL argues that the parties' course of conduct either confirms DHL's interpretation of the Agreement or modified the Agreement to conform to that interpretation. In support, DHL points to evidence that TNT was planning to move its business away from DHL even before DHL announced that it was restructuring its U.S. operations. (Def. Br. 35-36 & n.14.) Neither aspect of this two-pronged argument is persuasive. The first--that the Court should look at extrinsic evidence of TNT's course of conduct--is unavailing because it would require the Court to ignore the Agreement's unambiguous termination provision. The idea that DHL could walk away from the deal with no notice to TNT is belied by Article 18's plain language. Parol evidence of the parties' course of conduct is therefore irrelevant. See Nat'l Abatement Corp. v. Nat'l Union Fire Ins. Co., 33 A.D.3d 570, 571, 824 N.Y.S.2d 230, 232 (1st Dep't 2006) ("Interpreting the insurance contract under the same principles as any ordinary business contract, we find the subject provision unambiguous, and reasonably susceptible to only one meaning,

leaving no occasion to consider parol evidence of the parties' course of conduct." (internal citations omitted)); <u>239 E. 79th Owners Corp. v. Lamb 79 & 2 Corp.</u>, 30 A.D.3d 167, 168, 818 N.Y.S.2d 194, 195 (1st Dep't 2006) ("Indeed, a review of the clause in question does not reveal any genuine ambiguity, so that there is no occasion to consider the parties' course of conduct." (citation omitted)); <u>see</u> <u>also</u> <u>Union Chelsea Nat. Bank v. PGA Marketing Ltd.</u>, 166 A.D.2d 369, 370, 561 N.Y.S.2d 174, 175 (1st Dep't 1990) ("This form of written guarantee used by plaintiff is a fully integrated, unambiguous contract which by its terms cannot be modified or varied by parol evidence or by an alleged course of conduct.").

The second aspect of this argument--that the parties modified the Agreement through their behavior--is equally unavailing because it wholly lacks factual support. DHL is correct that although the Agreement had a no-oral-modifications clause (Agreement art. 20), such a provision may be overcome where "the conduct of the parties demonstrates an indisputable mutual departure from the written agreement," <u>Austin v. Barber</u>, 227 A.D.2d 826, 828, 642 N.Y.S.2d 972, 974 (3d Dep't 1996). Nevertheless, there is no evidence that the parties mutually departed from the written Agreement to an understanding whereby DHL could terminate the contract unilaterally and with no notice to TNT. Internal discussions concerning TNT's plans to migrate

its business away from DHL are not evidence that the parties changed their mutual understanding of their deal because contract modifications require objective, mutual assent. <u>See</u> <u>Porter v. Comm. Cas. Ins. Co.</u>, 292 N.Y. 176, 184, 54 N.E.2d 353 (1944) (noting that, in contract law, "secret intent" is immaterial). The evidence surrounding the August 11 Meeting does not help DHL, either. At best, DHL's evidence of this meeting shows that the participants discussed rumors that DHL might leave the United States market and that TNT was preparing for that contingency. (<u>See</u> Def. Br. 10.) TNT continued to perform under the Agreement until October, though, and DHL's evidence of the August 11 Meeting is not evidence of a course of conduct at all, much less a course of conduct sufficient to modify the parties' written contract. If anything, the parties' course of conduct was to obtain changes to their arrangement in writing. (<u>See</u> Amend. Nos. 1, 2, 3.) Further, that DHL tried to obtain TNT's written consent to Proposed Amendment No. 4, which would have effectively cancelled the Agreement, undercuts DHL's stance that both parties understood that DHL could walk away at any time.

Accordingly, TNT is entitled to a summary determination that DHL is liable for breaching the Agreement as

of the November 11 Letter.[4]  As discussed below, the amount of

TNT's damages is for a jury to decide.

III. Damages

DHL argues that TNT has not met its summary judgment

burden as to damages[5] and that, in any event, any damages to

which TNT is entitled are limited by the Agreement's termination

provision to the two-year notice period.

The Court agrees with DHL that TNT's damages are

limited to the two-year notice period.  It is settled that

expectation damages "should put the plaintiff in the same

economic position he would have occupied had the breaching party

performed the contract."  Oscar Gruss & Son, Inc. v. Hollander,

337 F.3d 186, 196 (2d Cir. 2003).  Here, DHL had an

unconditional right to terminate the Agreement without cause on

two years' notice.  (Amend. No. 2 ¶ 13.)  Courts in New York and

---

[4]  In its Reply, DHL argues that it is entitled to summary
judgment on TNT's "white spaces" claim--presumably the damages
to which TNT suffered as a result of DHL's withdrawal from
certain rural parts of the country.  TNT's theory is that DHL
breached the Agreement by ending its domestic services
altogether in late 2008, not when it restructured its operations
in May 2008.  (Compl. ¶ 28; see also Pl. Br. 1.)  DHL's request
is denied as moot in light of the Court's rulings that (1) DHL
breached the agreement as of its November 11 Letter and (2)
TNT's damages are limited to the two-year period following the
breach.

[5]  DHL argues that TNT should be denied summary judgment because
it has not set forth any admissible evidence as to damages.  In
light of the Court's decision granting DHL's own motion for
partial summary judgment and granting TNT's motion only as to
liability, this argument is moot.

elsewhere have recognized, in keeping with general principles of expectation damages, that "[w]here a contract permits a party to terminate upon notice, and a party fails to provide the required notice, contract damages are limited to the notice period." Millennium Aviation Servs., Inc. v. Gen. Dynamics Co., 335 F. App'x 76, 78 (2d Cir. 2009) (applying Connecticut law); see Trimed, Inc. v. Sherwood Med. Co., 977 F.2d 885, 892 (4th Cir. 1992) (applying New York law); 25 C.J.S. Damages § 110 ("Where a contract is terminable at any time on notice and it is terminated without notice, the damages which the aggrieved party may recover are limited to the notice period."); see also Royal's Reconditioning Corp., Inc. v. Royal, 293 Ill. App. 3d 1019, 1023-1024, 689 N.E.2d 237, 24, 228 Ill. Dec. 365, 368 (1st Dist. 1997) ("Numerous decisions from other jurisdictions concerning termination clauses in a variety of types of contracts also follow the reasoning that lost profits are limited to the amount that would have been earned during the contractual termination period." (collecting cases)).

By the November 11 Letter, DHL unequivocally indicated that it would no longer perform under the Agreement. DHL's conduct had the effect of ending the parties' relationship and DHL should be liable for the damages TNT suffered during the two-year notice period. In Bitterman v. Gluck, a New York court explained in the context of an employment contract that "[i]f the

employer has the unconditional right to terminate the contract of employment after a certain notice, discharge has the effect of notice to terminate and damages are allowed only up to the time the contract would have terminated if notice had been given." 256 A.D. 336, 337, 9 N.Y.S.2d 1007, 1008 (1st Dep't 1939). This rule is not limited--either textually or logically--to the employment law context, and TNT has not provided a persuasive reason to depart from it.

The Court is not persuaded by TNT's remaining arguments, either, and addresses briefly its contention that the Agreement's requirement that DHL provide a two-year cushion to ease TNT's transition to another carrier. In TNT's view, DHL's failure to provide the bargained-for "breathing space" left TNT at the mercy of the two major American shipping companies just as 2008's busy season was about to start (Pl. Reply 20-21) and that TNT is therefore entitled to damages for the full remaining contract term. (Id. at 24 ("DHL chose to eliminate TNT's transition period and, as a result, TNT will be forced to pay higher rates for the duration of the Agreement, if not beyond." (emphasis added).) It seems, though, that the higher costs TNT had to pay during the "breathing space" period are precisely the point: these are the damages to which TNT will be entitled if it can prove them at trial. TNT had no expectation of a locked-in contract beyond the two-year notice period because DHL was

permitted to terminate the contract on two years' notice without cause.

## CONCLUSION

For the following reasons, TNT's motion for summary judgment (Docket Entry 83) is GRANTED IN PART AND DENIED IN PART. It is granted as to liability and denied as to damages. DHL's motion for partial summary judgment limiting damages to the two-year notice period (Docket Entry 87) is GRANTED. The parties shall file their joint pre-trial order within thirty days from the date of this Order. They shall direct the pre-trial order to Magistrate Judge Lindsay in the first instance.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    February  23 , 2012
          Central Islip, New York